UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA

KEITH CARTER,                          )
                                       )
        Plaintiff,                     )
                                       )
    v.                                 )        CIVIL NO.  2:15cv107
                                       )
LAKE COUNTY COMMUNITY                  )
CORRECTIONS, *et al.*,                 )
                                       )
        Defendant.                     )

OPINION AND ORDER

This matter is before the court on a motion for summary judgment filed by the defendants

on May 31, 2016.  The plaintiff, Keith Carter ("Carter"), filed his response on August 10, 2016,

to which the defendants replied on September 6, 2016.

For the following reasons, the motion will be granted.

Summary Judgment

Summary judgment must be granted when "there is no genuine dispute as to any material

fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine

issue of material fact exists when "the evidence is such that a reasonable jury could return a

verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

Not every dispute between the parties precludes summary judgment, however, since "[o]nly

disputes over facts that might affect the outcome of the suit under the governing law" warrant a

trial. Id. To determine whether a genuine issue of material fact exists, the court must construe all

facts in the light most favorable to the non-moving party and draw all reasonable inferences in

that party's favor. Heft v. Moore, 351 F.3d 278, 282 (7th Cir. 2003). A party opposing a properly

supported summary judgment motion may not rely merely on allegations or denials in its own

pleading, but rather must "marshal and present the court with the evidence she contends will prove her case." Goodman v. Nat'l Sec. Agency, Inc., 621 F.3d 651, 654 (7th Cir. 2010).

Discussion

The defendants in this case are Lake County Community Corrections, Lake County, Board of Commissioners of Lake County, Lake County Community Corrections Advisory Board, Brian Johns, Jeffrey Batchelor, Mark Murphy, Lea Johnson, and Kellie Bittorf (collectively "Lake County"). Carter, who is African-American, has sued Lake County pursuant to Title VII, alleging race discrimination, harassment and retaliation.

Lake County has recited the following facts which it claims are not in dispute. Lake County Community Corrections is an agency in Lake County, Indiana, that oversees and supervises inmates on residential or work release programs in Lake County. During most times relevant, Kellie Bittorf was the Executive Director of Lake County Community Corrections. (Bittorf Decl., Ex. A, Dkt. No. 35-1, ¶ 2.).) Additionally, Mark Murphy was the Director of Operations, Jeffrey Batchelor was the Residential Manager, and Leah Johnson was the Budget and Personnel Manager. (Bittorf Decl. ¶¶ 2-3; Murphy Decl., Ex. B, Dkt. No. 35-2, ¶¶ 2-3;.Johns Decl., Ex. C, Dkt. No. 35-3 ¶ 2)

Most Lake County Community Corrections operations are centered at the "Kimbrough Center" (Carter Dep., Ex. D, Dkt. No. 35-4, 53:17-24) named after a local African-American judge who started the Community Corrections program. (Carter Dep. 54:11-19.) Because the building is named the Kimbrough Center for Judge James Kimbrough, there are a number of building features that include the letter "K." (Bittorf Decl. ¶¶ 4-6.) These include bookends that are decorated with the letter "K." (Bittorf Decl. ¶ 6; see also Carter Dep. Exs. B, L.)

In 2002, Carter began employment with Lake County Correctional Center as part-time Custody Officer. (Carter Dep. 22:6-8, 42:1-2.) Carter signed receipt of Lake County's Manual of Policies and Procedures on September 27, 2002, including the equal employment opportunity and anti-harassment policies. (Carter Personnel File, Ex. E, Dkt. No. 35-5 at 0048-0050.)

In 2003, while he was still a part-time employee, Carter was physically beaten by two former inmates. (Carter Dep. 97:18-25.) Those inmates were named Miles Beach and Eric Lewis. (Carter Dep. 97:18-25.) After the incident, Carter was told by Murphy and another official that Beach and Lewis would not be allowed back in Lake County Community Corrections programs. (Carter Dep. 98:1-3.)

In March 2004, Carter also applied for a supervisor position with Lake County Community Corrections. (Personnel File 0062-0063.) Ultimately, then-Executive Director Robert Hinojosa declined to hire Carter for that position. (Personnel File 0061.)  Later in 2004, Carter applied to become a full-time Custody Officer with Lake County Community Corrections. (Personnel File 0060.) This time, Hinojosa hired Carter to fill the full-time position. (Carter Dep. 22:9-11; Personnel File 0064.) Thereafter, from 2004 to 2008, Carter worked as a full-time Custody Officer. (Carter Dep. 42:7-10.)

In 2008, Carter transferred to a full-time Field Officer position. (Carter Dep. 42:11-13.) In 2010, Carter moved back to working as a full-time Custody Officer. (Carter Dep. 42:21-24.) In 2011, Carter again transferred to the full-time Field Officer position. (Carter Dep. 43:19-21.)

In 2011, Eric Lewis—one of the individuals involved in the original 2003 battery—was sentenced to serve a sentence with Lake County Community Corrections by the Lake County Superior Court. (Carter Dep. 98:21-25, 99:1-5.) Once this was discovered, however, Lewis was

removed from the Lake County Community Corrections program. The Lake County Superior Court—not Carter's supervisors—decides whether, how and when to sentence individuals to Community Corrections. (Carter Dep. 99:13-100:1.)

In 2013, Carter returned for a final time to the full-time Custody Officer position. (Carter Dep. 50:6-10.) Throughout his employment, Carter frequently worked with part-time Corrections Officer Jimmy Glass and Custody Officer Angela Steward. (Jimmy Glass Dep., Ex. F, Dkt. No. 35-6, 10:13-17; Steward Decl., Ex. G, Dkt. No. 35-7, ¶ 3.)

Throughout Carter's employment, he was aware of Lake County's policy against discrimination and harassment. (Personnel File 0048-0050.) In fact, the Handbook strictly prohibits discrimination based upon race. (Lake Co. Handbook, Ex. H, Dkt. No. 35-8, 0190.) The Handbook also prohibits harassment, including "[c]omments or actions that are deliberately hurtful, rude, unprofessional, or [that] offend other employees." (Handbook 0193.)

Lake County's Employee Handbook provides a procedure through which employees can bring complaints based on civil rights violations. (*See* Handbook 0186-0187, 0193-0194.) Employees with complaints about inappropriate or harassing behavior are encouraged to bring the behavior to their supervisors. (Handbook 0193-0194.) Any employees with complaints about discrimination in the work place "has a duty to immediately report the incident to the County Human Resources Consultant … in accordance with [County] policy." (Handbook 0190.)

In addition to these policies, the County also provides a very specific complaint procedure for civil rights complaints. (Handbook 0186-0187.) "Any employee who feels he/she has received unfair treatment in discipline, pay, promotion or assignment because of his/her race [or other protected characteristics] … may file a complaint." (Handbook 0186.) The policy also

4

refers all complaints to the County's Grievance Committee for investigation and determination. (Handbook 0186-0187.) The policy requires any complaint to "be filed within thirty (30) calendar days of the alleged discriminatory action." (Handbook 0187.)

During Carter's entire employment with Lake County Community Corrections, he did not complain about any discrimination, harassment, or other inappropriate conduct based on race. (Bittorf Decl. ¶ 8; Murphy Decl. ¶ 9; Johns Decl. ¶ 5.) In addition, two of Carter's coworkers, Glass and Steward never observed Johns, Batchelor, Murphy, Johnson, or Bittorf discriminate against or harass someone on the basis of race. (Glass Dep. 13:8-25, 14:1-21; Steward Decl. ¶ 5.)

Carter never availed himself of these policies, and he never complained regarding racial harassment in writing. (Bittorf Decl. ¶ 8; Murphy Decl. ¶ 9; Johns Decl. ¶ 5; Carter Dep. 24:11-14.) Carter never submitted a formal complaint to the Human Resources Consultant, nor did he submit a complaint to the Grievance Committee. (Murphy Decl. ¶ 9; Johns Decl. ¶ 5.)

On or about March 24, 2014, Lake County eliminated all full-time Custody Officer positions in its Community Corrections program. (Personnel File 0085.) These positions were eliminated for financial reasons. (Personnel File 0085.) In particular, the increased cost of health insurance led Lake County to determine that the cost of providing benefit packages to these full-time Custody Officers was too great for the budget. (Personnel File 0085.)

At the time of this decision, Lake County employed two individuals in the full-time Custody Officer position: Carter, who is African-American, and Algird Galinas, who is Caucasian. (Bittorf Decl. ¶ 11; Carter Dep. 119:8-11.) Neither Carter nor Galinas were terminated outright. Instead, both employees were placed in part-time positions with Lake County. (Bittorf Decl. ¶ 12.) After Carter and Galinas were placed in part-time positions, there

were no remaining individuals in the full-time Custody Officer position. (Carter Dep. 122:19-25.) There were also no people in the full-time Field Officer position. (Carter Dep. 123:1-6.)

Also, after the decision was made to eliminate the full-time Field Officer position, Johns, Murphy, and Batchelor all wrote positive letters of reference for Carter. (Carter Dep. 123:7-18; Personnel File 0070-0071.) These letters spoke very positively of Carter—calling him "very dedicated," saying he could be "count[ed] on" and "recommend[ing]" him. (Personnel File 0070-0071.) These letters make clear that "due to budget concerns, Mr. Carter's full-time position was eliminated." (Personnel File 0070-0071.) Johns stated that "I am pleased to continue to be able to work with him in that [part-time] capacity." (Personnel File 0071.)

Immediately upon learning of the termination of all full-time Field Officer positions, Carter submitted his Charge of Discrimination ("Charge") with the EEOC. (Personnel File 0001.) That Charge—filed on March 24, 2014—alleged discrimination on "5-20-2013" at the "[e]arliest" and on "5-20-2013" at the "[l]atest." (Personnel File 0001.)

That Charge states that "Batchelor" and "Johns" are both "white and Klu (sic) Klux Klan (KKK) members." (Personnel File 0001.) The Charge claims that Carter had been subjected to various "kinds of hostility and harassment since 2004," that he was told his "kind was not wanted there," and that "white management has been trying to get rid of me." (Personnel File 0001.) He claims the "last act" was on March 24, 2014 when he alleges he was "demoted" "to a part-time position. (Personnel File 0001.)

Nonetheless, after March 24, 2014, when he and Galinas were put on part-time status, Carter voluntarily left his employment at Lake County. (See Carter Dep. 126-14-22.) Carter stopped reporting to work but submitted no resignation at that time. (Johns Decl. ¶ 16.)

Finally, on August 5, 2014, Carter submitted a resignation letter. (Carter Dep. 128:6-9; Personnel File 0059.) In this resignation letter, Carter did not state that racial discrimination was related to his decision to resign. (Carter Dep. 128:6-9; Personnel File 0059.) Instead, he stated he was resigning "due to a lot of stress caused by … the Executive Staff by eliminating my full time Custody Officer position and moving me to part time. The reason given was allegedly due to budgetary downfalls and employees insurance." (Personnel File 0059.)

Carter also alleged that the budget was sufficient to keep his position and that "he got moved around and then demoted" when he "told you about hate symbols being displayed … in the building." (Personnel File 0059.) Additionally, Carter has stated that he could not afford to remain working for Lake County if he was employed only part-time. (Carter Dep. 128:10-12.)

During the investigation into his Charge, Carter discussed his reasons for resigning with the EEOC's investigator. (Carter Dep. 126:5-11, 127:5-21.) In a September 1, 2014 email, Carter stated to the investigator: "When I turned in my resignation letter, I put I was resigning because they, the executive staff, put a lot of stress on me by eliminating my full-time position." (Carter Dep. 126:5-11, 127:5-21.)

Following the filing of his Charge, Plaintiff has made a number of allegations for the first time against Lake County and the Individual Defendants. These allegations include:

Carter states that he received a picture in his work mailbox that had the word "Teamwork" on it; the picture was a photograph of rainbows and red and yellow tulips in an open field. (Carter Dep. 88:13-89:4, Carter Dep. Ex. F.) Under the photograph, the caption states: "Individually we are special; together we are spectacular." (Carter Dep. Ex. F.) Carter states that this picture is race-based because "the last song Hitler listened to was Blood Red Roses, and the

yellow roses are the yellow rose of Texas." (Carter Dep. 89:16-90:3.) Carter also stated, without

a reason, that the rainbow was a racist symbol. (Carter Dep. 90:4-8.)

Carter also stated that—at some time in 2010 or 2011—an unknown individual posted a picture

on a wall in the Community Corrections facility of a "black man with his pants sagging." (Carter

Dep. 83:15-22.) Carter does not have the picture or any evidence as to who posted it or how long

the photo was up. (Carter Dep. 83:19-20.)

Carter also claims that he saw a picture of Murphy, Batchelor, Johns, and Supervisor

Roderick Threatt in 2011 or 2012. (Carter Dep. 84:4-12.) In the picture, Carter claims that

Murphy, Batchelor, and Johns were portrayed as "The Brady Bunch," and Threatt was portrayed

as the character "Buckwheat." (Carter Dep. 84:4-12.) Carter does not have the picture or any

evidence as to who posted it or how long the photo was up. (Carter Dep. 84:4-12.)

As for the Kimbrough building itself, Carter states that in a supervisor's office, there are

two bookends in the shape of the letter "K." (Carter Dep. 64:11-17; Carter Dep. Ex. B.) The

bookends were shaped like the letter "K" because the building is named the Kimbrough Center.

(Murphy Decl. ¶¶ 4-6.)

Carter also alleges that Murphy has two "gray lightning bolts . . . and a five-point star" in

his office. (Carter Dep. 86:21-87:6.) Murphy has no such "lightning bolts" in his office, but he

does have a number of plaques with the Lake County Sheriff's star. (Murphy Decl. ¶ 17.)

Carter also states that somewhere in the Kimbrough building was a poster of a "black donkey

with a circle around it and a line drawn through it" in a secretary's office across from the break

room. (Carter Dep. 62:2-12.) Carter states that this poster was in the secretary's office from 2008

until 2012 or 2013. (Carter Dep. 62:19-24.) No such poster has ever been in the secretary's

office. (Johns Decl. ¶ 6; Glass Dep., 21:24-25, 22:1-10.)

Carter also cites to a poster of a group of skydivers with the word "Teamwork." (Carter Dep. 119:12-25, 120:1-25; Carter Dep. Ex. L.) That poster—with skydivers forming a pattern—is captioned: "Giving a hand makes all the difference." (Carter Dep. Ex. L.)

Finally, Carter complained of a fire evacuation plan for the Kimbrough building that has a "cross" on it to depiction escape routes. (Carter Dep. 77:4-8.) Carter claims the evacuation plan's cross was the German "Iron Cross" and, therefore, he claims it is also a symbol of the Ku Klux Klan. (Carter Dep. 77:19-25, 78:1-9; Carter Dep. Ex. D.)

Carter also stated that, in two copies of the Inmate Rule Book, he saw another depiction of a cross that he claims was an "Iron Cross." (Carter Dep. 81:22-82:2.) One copy of the Inmate Rule was hanging up on a wall, and the other was the copy available for all inmates and Custody Officers to view. (Carter Dep. 82:3-11.) Other than his testimony, Carter has provided no photos or other evidence of this symbol in the Inmate Rule Book.

Carter also alleges that he was harassed in other ways. He states that, in 2008, his schedule was changed for one shift. (Carter Dep. 55:5-9.) Carter typically worked the day shift, but he was scheduled to work a later shift on one particular day. (Carter Dep. 55:10-11; 57:9-11.) The reason for this one-time schedule change was a scheduling error. (Carter Dep. 55:15-16.)

At some point prior to 2011, certain individuals who worked at Lake County were given individual offices. (Carter Dep. 58:17-21; 60:6-7.) Carter states that he was not given an office. (Carter Dep. 58:17-21.) At the time, however, Carter was the only full-time Field Officer. (Carter Dep. 61:8-12.) As such, Carter worked his shift outside the office in the field, and only spent the up to the first twenty minutes of his shift inside the office. (Carter Dep. 60:12-23.) It is for this

reason that Carter was not assigned an office. (Johns Decl. ¶ 9.)

Carter also states that, once, a work schedule was provided to him with multiple "Ks" on it. (Carter Dep. 76:16-21; Carter Dep. Ex. O.) That schedule has a number of other numbers and letters coded on it as well, such as "N," "H," "V," "13," "Ct," "Pb," and "Bh." (Carter Dep. 136:2-9, 138:6-10, 139:22-25, 140:20-24, 141:5-10; Carter Dep. Ex. O.) The schedule is not official, and it unknown who created it. (Johns Decl. ¶ 7.) Nonetheless, the "Ks" on the alleged work schedule corresponds with regular days off for the listed employees. (Johns Decl. ¶ 7.)

Carter additionally states that, at one point in time, he saw Lake County business passes with the initials "SS." (Carter Dep. 79:1-6.; Carter Dep. Ex. E.) A Lake County employee named Shirley Snyder had the ability to approve such passes and, like other employees, signed her initials to do so. (Carter Dep. Ex. E; Johns Decl. ¶ 8.)

Finally, Carter states that, when he moved to the full-time Custody Officer position in 2004, he was told that he would become a supervisor but he was never moved into that role. (Carter Dep. 107:19-25, 108:1-2.) Carter states that he saw many people become supervisor instead of him, and he "watched a lot of people go ahead of [him] that wasn't black and some of them wasn't qualified that were [black]." (Carter Dep. 107:19-25, 108:1-2.) Of the individuals identified by Carter who became supervisors, two were black and five were white. (Carter Dep. 109:2-25, 110:1-12.)

Carter also for the first time makes allegations against Johns, too. Carter claims Johns made race-based jokes in front of Carter and to others. (Carter Dep. 26:18-20, 27:18-25, 28:1.) Johns denies making jokes based on race. (Johns Decl. ¶ 10.) Specifically, Carter states that, at some point during his eleven years of employment, he was typing his last name and left the letter

"R" out of his name. (Carter Dep. 39:12-16.) Afterwards, he claims Johns called Carter "Cater." (Carter Dep. 39:17-19.)

Carter also claims that, in 2004, Johns told him that "his kind was not wanted here." (Carter Dep. 74:21-25, 75:1-10.) Carter also claims that, because of this first statement, Johns was would repeatedly joke about this statement on later occasions. (Carter Dep. 75:1-10.) Johns denies making that comment at any time. (Johns Decl. ¶ 11.) Carter also states that, at some point during 2008 or 2009, Johns pointed a Taser gun at him. (Carter Dep. 76:11-15.) Johns denies this as well. (Johns Decl. ¶ 12.) Carter states that, in either 2011 or 2012, he heard Johns use the word "coon" at a company picnic. (Carter Dep. 85:3-10.) Johns denies making that comment. (Johns Decl. ¶ 13.) Carter also states that Johns allowed other employee to tell racial jokes from 2008 to 2012 or 2013. (Carter Dep. 85:11-17.) Johns denies allowing such conduct. (Johns Decl. ¶ 10.)

Carter states that Johns sent all employees an email with a link to the website of the Wounded Warriors Project after Johns' brother died. (Carter Dep. 93:7-20.) Johns was collecting donations for the Wounded Warriors Project in memory of his brother. (Carter Dep. 95:11-13.) The Wounded Warriors Project is an organization that supports military personnel who were wounded in war. (Carter Dep. 93:21-94:2.) Carter claims that certain pictures on the website were swastikas. (Carter Dep. 93:21-25, 94:1-2.; Carter Dep. Ex. I.) These pictures are not actually swastikas. (Carter Dep. Ex. I.)

Carter also saw a photo on the Wounded Warriors Project website of the character Dorothy from movie "The Wizard of Oz" lying in a field of poppies. (Carter Dep. 90:14-25, 91:1-3; Carter Dep. Ex. G.) Carter claims this photo shows a racial bias. (Carter Dep. 90:22-

91:3.) Carter acknowledges he never made a written complaint regarding the above conduct. (Carter Dep. 85:23-25.)

Carter also alleges that Murphy harassed him based upon his race. He alleges that Murphy would often refer to him as "Sergeant Carter," a character on the Gomer Pyle television show. (Carter Dep. 67:14-21.) The Sergeant Carter character on the show was a Caucasian character. (Carter Dep. 67:22-24.) Carter also states that a photograph outside of Murphy's office was harassing. (Carter Dep. 67:6-13; Carter Dep Ex. C.) In the photograph, Murphy is holding a firearm and acting as if he is about to shoot the firearm off camera; next to Murphy, Batchelor is covering his ears as if the firearm was being shot. (Carter Dep. 66:6-10; Carter Dep Ex. C.) Carter contends that this photograph is direct evidence that Batchelor and Murphy are in the Ku Klux Klan because "Ku Klux Klan" means "the sound of a gun." (Carter Dep. 66:24-67:1.)

Carter states that he verbally complained regarding certain conduct beginning in 2004. (Carter Dep. 24:15-22.) Specifically, Carter alleges that he verbally told Murphy about racial jokes and comments in the workplace, but Carter cannot recall the date or time that he did so. (Carter Dep. 32:18-25; Carter Dep. 74:21-75:10.)

In spite of the foregoing, Carter has testified that he was able to perform all of his job duties successfully during his employment at Lake County. (Carter Dep. 144:8-13.)

In support of its motion for summary judgment, Lake County first argues that, under Title VII, Carter cannot state claims against the individual defendants. A supervisor, in his or her individual capacity, does not fall within Title VII's definition of employer. *Williams v. Banning*, 72 F.3d 552 (7th Cir. 1995). In *Williams*, the Seventh Circuit found Title VII does not impose "employer" liability on a supervisor in his or her individual capacity. *Id*. at 552.

Carter has only brought claims under Title VII.[1] (Dkt. No. 1.) Carter has not brought any tort claim for assault, battery, or intentional infliction of emotional distress. (*Id*.) Accordingly, there is no basis for liability of the individual defendants. *Williams*, 72 F.3d at 552. Carter has not disputed that the claims against the individual defendants cannot proceed. Accordingly, summary judgment must be granted for the individual defendants on all of Carter's claims.

Next, Lake County argues that claims arising before May 28, 2013 are time-barred. As a precondition to filing suit in court, a party must first file a charge of discrimination with the EEOC within 300 days of the occurrence. *Alam v. Miller Brewing Co.*, 709 F.3d 662, 666 (7th Cir. 2013); *Doe v. R.R. Donnelley & Sons Co.*, 42 F.3d 439, 445 (7th Cir. 1994). The requirement of filing a charge with the EEOC "gives the employer some warning of the conduct about which the employee is aggrieved and affords the EEOC and the employer an opportunity to attempt conciliation without resort to the courts." *Id.* Claims that are not filed within 300 days of the occurrence of the act that is the basis of the complaint are time-barred. *Id. See also Hardin v. S.C. Johnson & Son, Inc.*, 167 F.3d 340, 344-45 (7th Cir. 1999).

In the present case, Carter filed his Charge of Discrimination with the EEOC on March 24, 2014. Thus, any claims based on any acts that occurred more than 300 days prior to that

---

[1] In his response brief, Carter, for the first time, claims that he is also pursuing a claim under 42 U.S.C. Section 1981, even though there is not a single reference to the statute in his Complaint. Carter relies upon a passing mention to the reference that his lawsuit "is initiated pursuant to Title VII of the Civil Rights Act and other pertinent laws." Carter contends that the phrase "other pertinent laws" put Lake County on notice of his Section 1981 claims. However, it is clear that this position has been rejected, and that a Complaint must specify upon which statute a plaintiff intends to proceed. *Chappey v. Ineos, USA LLC*, 2009 WL 790194, at *2-3 (N.D. Ind. 2009); *Deitrick v. Costa*, No. 4:06-cv-01556, 2015 WL 1606714, at *9 (M.D. Pa. Apr. 9, 2015); *ADT Sec. Servs., Inc. v. Swenson, ex rel. Estate of Lee*, 687 F.Supp.2d 884, 892–93 (D.Minn. 2009) (failing to plead violated statute warranted dismissal); *Bd. of Cnty. Comm'rs of Cnty. of La Plata, Colorado v. Brown Grp. Retail, Inc*., 598 F.Supp.2d1185, 1194–95 (D.Colo. 2009).

date—or May 28, 2013—are barred.

In both his Charge and his Complaint, Carter alleges individual acts that occurred prior to

May 28, 2013. (Personnel File 0001; Dkt. No. 1.) Carter is barred from bringing any claim that

relies on those individual allegations. Specifically, Carter alleges:

• Carter applied for and did not receive a supervisory position in 2004. (Carter Dep. 107:19-108:2; Personnel File 0061-0064.)

• In 2004 and at unspecified times thereafter, Johns told Carter that "his kind was not wanted here." (Carter Dep. 74:21-75:10.)

• In 2008, Carter's schedule was changed for one shift. (Carter Dep. 55:5-9.)

• Carter alleges Johns pointed a Taser gun at him in 2008 or 2009. (Carter Dep. 76:11-15.)

• Carter alleges Johns allowed other employees to tell racial jokes from 2008 to 2012 or 2013. (Carter Dep. 85:11-17.)

• From 2008 to 2012 or 2013, a poster of a "black donkey with a circle around it and a line drawn through it" was allegedly in the secretary's office across from the office break room. (Carter Dep. 62:2-12.)

• Prior to 2011, Carter was not given an individual office when he worked in the field. (Carter Dep. 60:12-23.)

• In 2010 or 2011, a picture was allegedly posted on a wall of a "black man with his pants sagging." (Carter Dep. 83:15-22.)

• In 2011, the Court sentenced Eric Lewis to Lake County Community Corrections in spite of Lake County's decision to ban him from the program after his battery on Carter. (Carter Dep. 98:21-99:5.) This was corrected.

• Carter alleges he heard Johns used the word "coon" at a company picnic in 2011 or 2012. (Carter Dep. 85:3-10.)

• Carter alleges saw a computer generated picture of African-American Supervisor Threatt portrayed as Buckwheat in 2011 or 2012. (Carter Dep. 84:4-12.)

• Murphy would refer to Carter as Sergeant Carter, a character on the Gomer Pyle

14

television show who was Caucasian. (Carter Dep. 67:14-24.)

• A photograph hung on the wall that showed Murphy pointing a firearm with Batchelor covering his ears. (Carter Dep. 67:6-13; Carter Dep. Ex. C)

• In Murphy's office, there were two "gray lightning bolts . . . and a five-point star" on the wall. (Carter Dep. 86:21-87:6.)

• Bookends in the shape of the letter "K" were in a supervisor's office. (Carter Dep. 64:11-17; Carter Dep. Ex. B.)

• A Teamwork poster hung in a supervisor's office above the bookends. (Carter Dep. 119:12-120:25.)

• A fire evacuation plan hung on the Kimbrough facility wall with a cross on it to mark evacuation routes, and Carter claims this cross was an "Iron Cross." (Carter Dep. 77:19-21; Carter Dep. Ex. D.)

Carter has not disputed Lake County's assertion that claims arising before May 28, 2013 cannot proceed. Because all of these discrete allegations occurred prior to May 28, 2013, Carter is barred from bringing any claims based upon them under Title VII. *Hardin*, 167 F.3d at 344-45.

Next, Lake County argues that Carter's harassment claim cannot succeed. In order to establish a *prima facie* case of harassment based on race, Carter must show that: "(1) he was subjected to unwelcome harassment; (2) the harassment was based on race; (3) the harassment unreasonably interfered with his work performance by creating an intimidating, hostile, or offensive working environment that seriously affected his psychological well-being; and (4) there is a basis for employer liability." *Herron v. DaimlerChrysler Corp.*, 388 F.3d 293, 302 (7th Cir. 2004). Carter must establish the environment was both subjectively and objectively offensive. *Id.*

Lake County asserts that Carter's allegations are insufficient to prove unlawful harassment. First, Lake County denies that the conduct occurred. (*See* Johns Decl. ¶¶ 6-14.) Nonetheless, assuming for purposes of summary judgment that Carter's allegations are true, as

discussed below, this conduct is not unlawful harassment.[2]

Title VII is not implicated where harassment is not based on a protected characteristic. *Patton v. Indianapolis Public Sch. Bd.*, 276 F.3d 334 (7th Cir. 2002). "The mere fact that most of the harassment was committed by persons of a race other than [the plaintiff's] does not mean that race was the motivating factor." *Collins v. Buechel Stone Corp.*, 390 F. Supp. 2d 810, 815 (E.D. Wis. 2005). An individual may be harassed "for any number of (bad) reasons," but that harassment is not actionable unless it is based on an "impermissible" reason such as race. *Id.* The vast majority of Carter's allegations cannot be characterized as race-based. Specifically, there is no evidence that any of the following allegations are based upon Carter's race:

   • Carter applied for and did not receive a supervisory position in 2004. (Carter Dep. 107:19-108:2; Personnel File 0061-0064.) But, throughout Carter's time at Lake County, seven people were promoted to supervisor—two were black and five were white. (Carter Dep. 109:2-110:12.)

   • Johns purposefully mispronounced Carter's last name as "Cater," because Carter once misspelled his name as Cater. (Carter Dep. 39:12-19.)

   • Johns pointed a Taser gun at Carter in 2008 or 2009. (Carter Dep. 76:11-15.)

   • Murphy called Carter "Sergeant Carter" after a Caucasian television show character. (Carter Dep. 67:14-24.)

   •Carter's scheduled was changed in 2008 for one shift due to a scheduling error. (Carter Dep. 55:9-16.)

   •Carter did not receive an individual office in 2011 because he worked out in the field. (Carter Dep. 58:17-21; 60:6-23; 61:8-12; Johns Decl. ¶ 9.)

   •In 2011, the Court sentenced Eric Lewis to Lake County Community Corrections in spite

---

[2] Additionally, most of Carter's claims are clearly factually frivolous, and are not sufficient to defeat summary judgment. *Denton v. Hernandez*, 504 U.S. 25, 32-33 (1992); *Neitzke v. Williams*, 490 U.S. 319, 327 (1989); *Minnis v. Much Shelist Freed Denenberg & Ament, P.C.*, 3 F. Supp. 2d 877, 884 (N.D. Ill. 1997).

of Lake County's decision to ban him from the program after his battery on Carter. (Carter Dep. 98:21-99:5.) This was corrected.

• An unidentified work schedule had the letter "K" printed multiple times on it corresponding with regular days off for the employees listed thereon. (Carter Dep. 71:16-21; Carter Dep. Ex. O; Johns Decl. ¶ 7.)

•A Lake County business pass had the initials "SS" on them because an employee who approved passes was named Shirley Snyder. (Johns Decl. ¶ 8.)

• A picture with the word "Teamwork" on it was provided to Lake County employees to promote a positive culture of teamwork. (Carter Dep. Ex. F.)

• A photograph of Murphy pretending to shoot a gun and Batchelor covering his ears. (Carter Dep. 66:6-10; Carter Dep. Ex. C.)

•A picture posted by an unknown person depicting Murphy, Batchelor, and Johns portrayed as The Brady Bunch, and (African-American Supervisor) Threatt portrayed as the character Buckwheat. (Carter Dep. 84:4-12.)

•The Wounded Warriors Project website. (Carter Dep. 93:7-94:2; 95:11-13.)

•A still shot of Dorothy from the movie "The Wizard of Oz." (Carter Dep. 90:14-91:3; Carter Dep. Ex. G.)

•Plaques in Murphy's office which allegedly have "lighting bolts" and a five-pointed star. (Murphy Decl. ¶ 17.) Murphy does in fact have plaques with the Lake County Sheriff's five-pointed start in his office. (Murphy Decl. ¶ 17.)

•A photo was posted of a "black man with his pants sagging." (Carter Dep. 83:15-22.) There is no evidence of this photo, and no evidence that the photo portrayed the man in a negative light.

• An alleged picture of a black donkey. (Carter Dep. 62:2-24; Johns Decl. ¶ 6.)

• Bookends shaped like the letter "K," that were in the building because the building is named after Judge Kimbrough. (Carter Dep. 53:17-25, 54:1-19; 64:21-25, 65:1-2; Carter Dep. Ex. B; Murphy Decl. ¶¶ 4-6.)

• A poster that says "Teamwork" and has a picture of skydivers in a circle formation. (Carter Dep. 119:12-120:25; Carter Dep. Ex. B.)

• A fire evacuation plan with a "cross" used to mark evacuation routes. (Carter Dep.

77:19-21; Carter Dep. Ex. D.)

Carter has failed to show that any of the above conduct or imagery is based on race. *Patton*, 276

F.3d 334. Therefore, summary judgment is appropriate.

Lake County further asserts that it is also entitled to summary judgment because the

conduct alleged by Carter was not so severe or pervasive that it interfered with Carter's work

performance. *Herron*, 388 F.3d at 302. In order to be actionable harassment, a work environment

must have been both objectively and subjectively offensive, one that a reasonable person would

find hostile or abusive, and one that the victim in fact did perceive to be so. *Faragher v. City of*

*Boca Raton*, 524 U.S. 775, 787 (1998).

Courts must consider all of the circumstances, including the frequency of the alleged

conduct; its severity; whether it was physically threatening or humiliating, or a mere offensive

utterance; and whether it unreasonably interferes with an employee's work performance. *Harris*

*v. Forklift Systems, Inc.*, 510 U.S. 17, 23 (1993). *See also Faragher*, 524 U.S. at 787 (only

conduct which is so "'severe or pervasive' as to 'alter the conditions of the victim's employment

and creates an abusive working environment' violates Title VII"). Isolated incidents, unless

extremely serious, are insufficient to state a claim for a hostile work environment. *Johnson v.*

*Riverside Healthcare System, LP*, 516 F.3d 759, 765 (9th Cir. 2008); *Ngeunjuntr v. Metropolitan*

*Life Ins. Co.*, 146 F.3d 464, 467 (7th Cir. 1998). "The workplace that is actionable is the one that

is hellish." *Logan v. Kautex Textron North America*, 259 F.3d 635, 641 (7th Cir. 2001).

Here, there is no evidence that any of the conduct rises to the level of severe or pervasive

such that it interfered with Carter's work performance. *Herron*, 388 F.3d at 302. In fact, Carter

admitted that the conduct did not affect his ability to perform all of his job duties successfully

during his employment at Lake County. (Carter Dep. 144:8-13.) Further, Carter only alleges four

incidents that could conceivably be based on race—only one of which is not time-barred:

> • Johns told Carter in 2004 and at unspecified times thereafter that "his kind was not wanted here." (Carter Dep. 74:21-25, 75:1-10.)

> • Carter alleges he heard Johns use the word "coon" at a company picnic in 2011 or 2012. (Carter Dep. 85:3-10.)

> •Johns allowed other employees to tell racial jokes in front of Carter from 2008 to 2012 or 2013. (Carter Dep. 85:11-17.)

> •An "Iron Cross" was in the copy of the Inmate Rule Book that hung on the wall and the copy that was made available for all inmates. (Carter Dep. 81:22-25, 82:1-11.) Carter has provided no evidence of the existence of this marking in these copies of the Inmate Rule Book other than his deposition testimony.

An isolated incident such as the marking of an "Iron Cross" in an Inmate Rule Book is

insufficient to state a claim for hostile work environment. *Ngeunjuntr*, 146 F.3d at 467. Further,

Carter never reported this conduct. (Carter Dep. 24:11-14.) Carter testified that he only verbally

reported certain jokes and comments to Murphy, but Carter could not recall the date or time that

he made the report. (Carter Dep. 24:11-14, 32:18-25, 74:21-25, 75:1-10.) Thus, there is no

evidence that the harassment was so severe or pervasive as to alter the conditions of Carter's

employment. Accordingly, summary judgment is appropriate on Carter's harassment claim for

this reason also.

Lake County next argues that it is entitled to summary judgment on any race

discrimination claim because similarly situated employees outside the protected class were not

treated more favorably. Title VII makes it unlawful for an employer to discriminate against an

individual because of, among other things, the individual's race. 42 U.S.C. § 2000e-2(a)(1). In

order to prevail on his race discrimination claim, Carter must present either direct or indirect

evidence of discriminatory intent by Lake County. *Troupe v. May Dept. Stores*, 20 F.3d 734, 736 (7th Cir. 1994).

Direct evidence must be supported by allegations which, "if believed by the trier of fact, will prove the particular fact in question without reliance upon inference or presumption." *Eiland v. Trinity Hosp.*, 150 F.3d 747, 751 (7th Cir. 1998) (citation omitted). Carter has presented no "smoking gun" direct evidence of race discrimination. Therefore, Carter must produce circumstantial evidence of discrimination or he must proceed under the indirect method of proof.

Without "smoking gun" direct evidence, Carter must provide circumstantial evidence of discrimination. Circumstantial evidence includes evidence of suspicious timing, ambiguous statements or behavior, similarly situated employees that receive better treatment, or evidence of pretext. *Dickerson*, 657 F.3d at 601.

In the present case, there is no evidence of a similarly-situated person being treated differently. A similarly situated employee is one who is "directly comparable to [the charging party] in all material respects." *Patterson v. Avery Dennison Corp.*, 281 F.3d 676, 680 (7th Cir. 2002). But to be directly comparable, Carter must identify someone with the same supervisor, who had the same job description, and who was subject to the same standards, but who was treated differently. *Bio v. Fed. Express Corp.*, 424 F.3d 593, 597 (7th Cir. 2005).

The evidence shows that Lake County made the financial decision to eliminate all full-time Custody Officers. (Bittorf Decl. ¶¶ 9-11.) There were two individuals in the full-time Custody Officer position: Carter and Galinas, a Caucasian. (Bittorf Decl. ¶ 11.) Both employees were treated in the same manner. (Bittorf Decl. ¶¶ 11-12.) Lake County offered both Carter and the Caucasian employee part-time positions with Lake County. (Bittorf Decl. ¶ 12.) Clearly,

similarly situated employees outside the protected class were not treated more favorably.

Additionally, Carter has identified no ambiguous statements or suspicious timing with regard to the elimination of the full-time positions. Carter has noted that he complained about Murphy's alleged jokes and comments, but Carter cannot recall the year, date, or time he allegedly did this. (Carter Dep. 32:18-25, 74:21-25, 75:1-10). Similarly, there is no timing which ties the elimination of the full-time positions to discriminatory reasons. As a result, there are no ambiguous statements or suspicious timing giving rise to an inference of discrimination.

Finally, there is no pretext to establish circumstantial evidence of discrimination. The issue of pretext does not address the correctness or desirability of the reasons offered for employment decisions. Rather, it addresses the issue of whether the employer honestly believes in the reasons it offers. *Hague v. Thompson Distrib. Co.*, 436 F.3d 816, 823 (7th Cir. 2006). Pretext is more than a mistake on the part of the employer; it is a lie. *Hudson v. Chicago Transit Authority*, 375 F.3d 552, 561 (7th Cir. 2004). The undisputed material facts in this case show that Lake County's decision to move Carter from a full-time to a part-time position was not based on a lie. Lake County's decision to eliminate the full-time Custody Officer position was a business decision based on Lake County's budget. Eliminating a position due to financial necessity is a legitimate business reason. *Rummery v. Illinois Bell Tel. Co.*, 250 F.3d 553, 556 (7th Cir. 2001); *Williams v. United Tech. Carrier Corp.*, 310 F. Supp. 2d 1002, 1014 (S.D. Ind. 2004). A court should not second guess the decision-maker's business judgment regarding the employer's financial concerns. *Id.* Clearly, Carter has not presented sufficient circumstantial evidence to proceed under the direct method of proof.

To present a claim under the indirect method of proof, Carter must prove: (1) he was a member of a protected class; (2) he was meeting legitimate expectations; (3) he suffered an adverse employment action; and (4) similarly situated employees outside the protected class were treated more favorably. *Wade v. Lerner New York, Inc.*, 243 F.3d 319, 322 (7th Cir. 2001). The burden then shifts to Lake County to provide a legitimate non-discriminatory reason for any adverse employment action taken against Carter. *Texas Dep't of Cnty, Affairs v. Burdine*, 450 U.S. 248, 252, 253 (1981). If Lake County is able to make this showing, Carter must come forward with evidence that shows the legitimate non-discriminatory reason was a pretext—not that this reason was wrong, but that it was a lie. *Id.*

In the present case, Carter's *prima facie* case fails because similarly situated employees outside the protected class were not treated more favorably. On the contrary, the evidence establishes that Lake County treated all full-time officers the same, regardless of race, because it eliminated both full-time positions. The only person similarly situated to Carter—Galinas—also had his position eliminated. Thus, Carter cannot establish a *prima facie* case of discrimination.

Moreover, even if Carter could maintain a *prima facie* case of race discrimination, Lake County had a legitimate, non-discriminatory reason for eliminating his position and offering him a part-time position. Carter (and another employee) was moved to a part-time position due to the elimination of his position because of Lake County's budget. (Bittorf Decl. ¶¶ 9-11.) Again, eliminating a position due to financial necessity is a legitimate business reason. *Rummery v. Illinois Bell Tel. Co.*, 250 F.3d 553, 556 (7th Cir. 2001).

Also, Carter cannot establish that this decision was pretextual. Rather, the undisputed material facts show that Lake County's decision to move Carter from a full-time to a part-time

position was based upon legitimate budgetary reasons. There is no evidence to the contrary. Therefore, Carter cannot proceed under the indirect method of proof. Accordingly, summary judgment must be granted in favor of Lake County on Carter's race discrimination claim.

Lake County next argues that it is entitled to summary judgment on Carter's retaliation claim. Title VII prohibits retaliation against an employee who has engaged in protected activity. To succeed under the direct method of proof, a plaintiff must show: (1) he engaged in statutorily protected activity; (2) he suffered an adverse employment action; and (3) there is a causal connection between the two. *Everroad v. Scott Truck Sys., Inc.*, 604 F.3d 471, 481 (7th Cir. 2010) (citing *Haywood v. Lucent Techs., Inc.*, 323 F.3d 524, 531 (7th Cir.2003)).

Alternatively, under the indirect method of proof, a plaintiff must show: (1) he engaged in statutorily protected activity; (2) he met the employer's legitimate expectations; (3) he suffered an adverse employment action; and (4) he was treated less favorably than similarly situated employees who did not engage in statutorily protected activity. *Kodl v. Bd. of Educ. Sch. Dist. 45, Villa Park*, 490 F.3d 558, 562 (7th Cir. 2007) (citing *Tomanovich v. City of Indianapolis*, 457 F.3d 656, 663 (7th Cir. 2006)). Carter's retaliation claim fails under both methods.

Lake County contends that Carter's claim cannot succeed under the direct method of proof because Carter did not engage in statutorily protected activity, and there is no causal connection between the elimination of the full-time positions and any alleged protected activity. First, Carter did not engage in protected activity. During Carter's employment, he did not submit any formal complaints about any inappropriate conduct or imagery described above. (Bittorf Decl. ¶ 8; Murphy Decl. ¶ 9; Johns Decl. ¶ 5.) Carter never filed a complaint with Lake County Human Resources or the Grievance Committee regarding racial harassment. (Bittorf Decl. ¶ 8;

Murphy Decl. ¶ 9; Johns Decl. ¶ 5; Carter Dep. 24:11-24.)

Carter does state that he told Murphy about jokes in the workplace. (Carter Dep. 32:18-25, 74:21-25, 75:1-10.) However, Carter cannot recall the year, date, or time that he made the report. (*Id.*) Further, Murphy asserts that he never received any report, verbal or written, from Carter reporting inappropriate conduct. (Murphy Decl. ¶ 9.) Even if Carter did tell Murphy about the jokes, "merely complaining in general terms of discrimination or harassment, without indicating a connection to a protected class or providing facts sufficient to create that inference, is insufficient." *Tomanovich*, 457 F.3d at 663.

Even if Carter did engage in protected activity, there is nothing to connect the concerns allegedly raised by Carter to his demotion. "The mere fact that one event preceded another does nothing to prove that the first event caused the second." *Sauzek v. Exxon Coal USA, Inc.*, 202 F.3d 913, 918 (7th Cir. 2000). Carter cannot identify the dates that he allegedly reported his concerns regarding the jokes to Murphy. (Carter Dep. 32:18-25, 74:21-25, 75:1-10.) Regardless, a time period as short as seven weeks between any protected activity and the adverse action is insufficient as a matter of law to support a claim for retaliation. *See Argyropoulos v. City of Alton*, 530 F.3d 724, 734 (7th Cir. 2008) (seven-week period between events is insufficient); *Turner v. The Saloon, Ltd.*, 595 F.3d 679, 690 (7th Cir. 2010). Moreover, the elimination of the full-time Custody Officer position was based solely on the financial considerations of Lake County and affected all similarly situated employees equally. (Bittorf Decl. ¶ 10.)

Carter's retaliation claim also fails under the indirect method of proof. Carter's claim fails under this method because he (1) he did not engage in protected activity, and (2) he was not

treated less favorably than similarly situated employees who did not engage in protected activity. As discussed above, Carter did not engage in protected activity. Moreover, as stated above, Carter was not treated less favorably than any similarly situated employees who did not engage in statutorily protected activity. The Caucasian employee whose position was also eliminated, Galinas, had not engaged in any statutorily protected activity. (Murphy Decl. ¶ 18.) In addition, as discussed above, there is no evidence of pretext in this matter. Accordingly, Lake County is entitled to summary judgment on all retaliation claims.

<u>Conclusion</u>

On the basis of the foregoing, the defendants' motion for summary judgment is hereby GRANTED in its entirety.


 Entered: October 3, 2016.


                                                    s/ William C.  Lee
                                                    William C. Lee, Judge
                                                    United States District Court